IN THE SUPREME COURT OF TEXAS






IN THE SUPREME COURT OF TEXAS
 
════════════
No. 04-0961
════════════
 
Tony Gullo Motors I, L.P. and 
Brien Garcia , Petitioners,
 
v.
 
Nury Chapa, 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Ninth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued October 19, 
2005
 
 
Justice O’Neill, dissenting.
Nury Chapa’s 
allegations describe what amounts to a bait-and-switch by Gullo Motors, a claim 
the jury and this Court agree there is evidence to support. The evidence shows 
that, in furtherance of that scheme, Chapa was threatened, lied to, and her 
signature and that of her deceased husband were forged. The defendant’s conduct 
in this case was at best reprehensible, and bordered on criminal, prompting the 
jury to award $250,000 in exemplary damages. Texas law capped that award at 
$200,000, and the court of appeals further reduced it by remittitur to $125,000. 
Even though the remitted award is well below the statutory ceiling that the 
Legislature set, the Court today decides the appeals court award is exorbitant 
and cannot stand. I do not agree that the court of appeals violated 
constitutional exorbitancy standards by suggesting the remittitur that it did, 
nor do I agree with the Court’s advisory determination of the attorney’s fee 
issue. Accordingly, I respectfully dissent. 
I. Background 
The evidence 
supporting the verdict in this case demonstrates that Chapa purchased a Toyota 
Highlander Limited from Gullo Motors, but Gullo Motors tried to make her accept 
instead a less expensive Toyota Highlander. According to Chapa, she offered her 
salesman, Brien Garcia, $30,000 for the Highlander Limited on the showroom 
floor, with the added options of a TV/VCR and Michelin tires. After consulting 
with management, Garcia responded that the showroom car had been sold but he 
could get her one for $207.38 more. Chapa agreed, but when she returned to sign 
the contract it only indicated she was buying a “2002 Toyota.” Chapa wrote 
“Limited,” “Michelin tires,” “TV” and “VCR” on the contract and then signed it. 
She was told more signatures were needed and a copy would be mailed to her. 
Chapa never received the contract.
After sending 
in her $30,207.38 payment, Chapa received a call informing her that the vehicle 
had arrived. Chapa went to pick it up, but Garcia presented her with a 
Highlander, not a Highlander Limited. When Chapa refused to take it, Garcia 
acknowledged that she had purchased a Highlander Limited and assured her she 
would get one.
Again, a 
sales representative called Chapa to say her car was ready, and again a 
Highlander, not a Highlander Limited, was presented to her. Chapa complained, 
but Gullo told her the Highlander she was taking had a V-6 engine just like the 
Limited; in addition, Gullo promised to add the other features from the Limited, 
plus the Michelin tires, and assured her the modifications would be complete in 
two days. Chapa agreed to take delivery of the Highlander, but insisted Gullo 
Motors write these promises on her new delivery check sheet, which she then 
signed. Garcia wrote her a “We Owe” form, which stated Gullo owed her Michelin 
tires and lumbar seats. He did not include the other items, so Chapa listed them 
on the delivery check sheet; she testified Garcia told her that was enough. 
When Gullo 
Motors failed to install the promised items, Chapa went to the dealership to 
speak with Brian Debiski, the sales manager. Debiski told Chapa she was “crazy, 
that [she] didn’t buy that [Limited].” Chapa explained that she had a “We Owe” 
form, but Debiski responded, “[Y]ou have nothing. You are a nobody. It’s your 
word against me.” When Chapa told him she would inform the media, Debiski 
responded that “nobody will dare to go against me, against us,” and informed 
Chapa that he would show her by having her car towed away at her expense. 
Later, when 
Chapa’s attorney informed the dealership that Chapa would like to return the car 
for a refund, Gullo refused, claiming the Highlander had already been titled to 
Chapa (even though it had not) and explaining that it would thus have to sell 
the car as used. Gullo produced a New Vehicle Delivery Check Sheet showing Chapa 
had accepted delivery of the Highlander without complaint. However, Chapa 
testified that Gullo forged her deceased husband’s signature on the delivery 
check sheet by using documents her late husband, Ernesto Chapa, had signed when 
they had previously bought a car from Gullo. Chapa also claimed that Gullo 
forged her deceased husband’s signature on the “We Owe” form. Chapa testified 
that numerous other documents were forged, and there was evidence that Garcia 
admitted to Gullo he had promised Chapa the features listed on the “We Owe” 
form. 
The jury 
found Chapa’s evidence credible and awarded her $7,213 for breach of contract 
(the difference in value between the vehicle promised and the one delivered), 
$7,213 for fraud, $21,639 for mental anguish, $250,000 for exemplary damages, 
$7,213 for damages under the Texas Deceptive Trade Practices Act, and $20,000 
for attorney’s fees. The trial court rendered judgment only on the breach of 
contract claim, but the court of appeals reversed and reinstated all the awards 
except for exemplary damages, which the court remitted to $125,000, one-half of 
what the jury awarded. 
I agree with 
the Court that Chapa must elect only one liability theory upon which to recover, 
and the court of appeals erred to the extent it concluded otherwise. But I 
disagree that the court of appeals’ remittitur is constitutionally infirm or 
that Chapa’s attorney’s fees are capable of segregation. 
II. Exemplary Damages
In Texas, the 
amount of exemplary damages for which a defendant may be liable is capped at 

an amount 
equal to the greater of: 
 
(1)        
(A) two times the amount of economic damages; plus
 
(B) an 
amount equal to any noneconomic damages found by the jury, not to exceed 
$750,000; or
 
(2) 
$200,000. 
Tex. Civ. Prac. & Rem. Code § 
41.008(b) (emphasis added). I agree with the Court that the mere existence of a 
statutory cap does not foreclose a federal constitutional check for exorbitancy. 
But the United States Supreme Court has instructed that reviewing courts should 
accord “substantial deference” to legislative judgments concerning appropriate 
sanctions. BMW of N. Am. v. Gore, 517 U.S. 559, 583 (1996). “[A] punitive 
damages award that comports with a statutory cap provides strong evidence that a 
defendant’s due process rights have not been violated.” Rodriguez-Torres v. 
Caribbean Forms Mfr., Inc., 399 F.3d 52, 65 (1st Cir. 2005) (citing 
Romano v. U-Haul Int’l, 233 F.3d 655, 673 (1st Cir. 2000)). The 
award the Court finds excessive today is well below the statutory cap that the 
Legislature determined appropriate when a defendant engages in conduct that 
would support an exemplary damages award. Neither does the award violate the 
three-part test for constitutional exorbitancy that the United States Supreme 
Court has articulated. See State Farm Mut. Auto. Ins. Co. v. Campbell, 
538 U.S. 408, 418-19 (2003). 
Courts must 
consider three guideposts when reviewing an exemplary damage award: (1) the 
degree of reprehensibility of the misconduct; (2) the disparity between the 
actual or potential harm suffered by the plaintiff and the punitive damages 
award; and (3) the difference between the punitive damages awarded by the jury 
and the civil or criminal penalties that could be imposed for comparable 
misconduct. Id.; Gore, 517 U.S. at 575. According to the Supreme 
Court, it is “the degree of reprehensibility of the defendant’s conduct” that is 
“[t]he most important indicium of the reasonableness of a punitive damages 
award,” and five factors guide that assessment: (1) whether the harm caused was 
physical rather than economic, (2) whether the conduct evinced an indifference 
to others’ health or safety, (3) whether the harm involved repeated acts or 
isolated incidents, (4) whether the target of the conduct was financially 
vulnerable, and (5) whether the harm resulted from mere accident or from 
“intentional malice, trickery, or deceit . . . .” 
Campbell, 538 U.S. at 419.
The Court 
summarily concludes that only the last of these factors, deceitful conduct, 
favors Chapa. And the Court gives that conduct very cursory attention, even 
though the Supreme Court has said that the “infliction of economic injury, 
especially when done intentionally through affirmative acts of misconduct . 
. . can warrant a substantial penalty.” Gore, 517 U.S. at 576 (citing 
TXO Prod. Corp. v. Alliance Res. Corp. 509 U.S. 443, 453 (1993)). 
Assuming Chapa elected to recover on the jury’s fraud finding, she would be 
entitled to $28,852 in compensatory damages. Thus, the penalty the court of 
appeals determined to be appropriate reflects a ratio between compensatory and 
exemplary damages of a little more than 4 to 1, a differential the petitioners 
have not demonstrated is constitutionally disproportionate to the defendant’s 
conduct here. See TXO Prod. Corp., 509 U.S. at 462 (holding a 10 
to 1 ratio permissible); Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 
19 (1991) (affirming award of four times compensatory damages and two hundred 
times economic damages); Glasscock v. Armstrong Cork Co., 946 F.2d 1085, 
1095-96 (5th Cir. 1991) (upholding a 20 to 1 ratio). 
As for the 
other reprehensibility factors, the Court either misapplies them or gives them 
short shrift. For example, the Court’s conclusion that Gullo’s actions caused 
Chapa only economic harm ignores the jury’s award of mental anguish damages, a 
damage element we have long considered non-economic that compensates for harm 
with physical elements. See Golden Eagle Archery, Inc. v. Jackson, 116 
S.W.3d 757, 763 (Tex. 2003). The Court also concludes Gullo Motors’ misconduct 
was an isolated incident that did not involve repeated acts, even though the 
evidence indicates otherwise. Gullo Motors committed multiple acts of 
misconduct, including switching contracts, altering documents, engaging in 
deceptive and threatening behavior, and even forging the signatures of Chapa and 
her deceased husband. In sum, the factors that the Court purports to follow in 
determining the reprehensibility of Gullo Motors’ conduct weigh in favor of the 
court of appeals’ remitted award, not against it. 
The second 
guidepost used to review an exemplary damage award examines the ratio between 
exemplary and compensatory damages. The Supreme Court has refused to adopt a 
bright-line constitutionally prohibited ratio. Instead, it has suggested a range 
beyond which exemplary damage awards will likely become constitutionally 
exorbitant, stating “few awards exceeding a single-digit ratio between punitive 
and compensatory damages, to a significant degree, will satisfy due process.” 
Campbell, 538 U.S. at 419. The Court’s opinion in this case highlights a 
17 to 1 ratio that reflects a comparison between the remitted award and 
economic damages. The constitutionally relevant comparison, though, 
focuses on compensatory rather than economic damages, which yields a much 
lower 4.33 to 1 ratio. 
The third 
guidepost considers civil or criminal penalties that could be imposed for 
comparable misconduct. Campbell, 538 U.S. at 48; Gore, 517 U.S. at 
575. The Court considers two potential civil penalties of $10,000 and $20,000 
that Gullo Motors’ conduct might subject it to, yet declines to consider 
potentially applicable criminal penalties that, according to Chapa, would result 
in jail time and $80,000 in felony fines for forgery, document destruction, and 
fraudulently inducing signatures. Certainly I agree that “the remote possibility 
of a criminal sanction does not automatically sustain a punitive damages award,” 
as the Court recites, but that doesn’t mean comparable potential criminal 
sanctions should be altogether ignored. Campbell, 538 U.S. at 428. 
In my view 
the more important issue is not the actual dollar amount that Chapa will 
ultimately recover, but the low threshold this Court steps over to declare a 
jury award constitutionally exorbitant. Had I been on the jury in this case, I 
may well have disagreed with the amount of exemplary damages the jury actually 
awarded or even the amount the appellate court suggested in its remittitur. 
Although exemplary damage awards can serve worthwhile purposes, they can also 
have debilitating economic impact and should be carefully policed by the courts. 
See Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex. 1994). Our courts 
of appeals in Texas have long been empowered to suggest a remittitur of 
excessive awards when the evidence is factually insufficient to support them. 
Id.; Tex. R. App. P. 46.3. 
The court of appeals assiduously exercised that power in this case. It is, of 
course, appropriate for this Court to intervene if the appeals court allows a 
constitutionally offensive award to stand. But when the Court chooses a marginal 
case like this in which to intervene, it risks intruding upon an area that has 
traditionally been the well-patrolled province of our courts of appeals. And 
when, as here, the Legislature has chosen to set its own parameters for such 
awards, the Court’s intrusion is even more disturbing.
III. Attorney’s Fees
I also 
question the Court’s decision to address the attorney’s fee issue in this case. 
If the court of appeals renders judgment on remand based on the jury’s fraud 
finding, the attorney’s fee issue will be moot. Thus, the Court’s analysis of 
the issue is purely advisory. Tex. 
Const. art. II, § 1; Brooks v. Northglen Ass’n, 141 S.W.3d 158, 
164 (Tex. 2004). But even assuming the Court properly reaches the issue, I 
disagree with the Court’s application of the rule it announces. According to the 
Court, when the legal services themselves advance both a recoverable and 
unrecoverable claim, segregation is not required. The Court concludes that at 
least some of Chapa’s attorney’s fees are attributable only to claims for which 
fees are not recoverable, requiring a new trial. It is true that some of Chapa’s 
attorney’s fees are attributable to her common-law fraud claim for which fees 
are not recoverable. Attorneys fees are recoverable, though, under the DTPA for 
deceptive acts or practices. It is unclear to me, and the Court does not 
explain, how the legal services used to advance Chapa’s DTPA claim did not also 
advance her common-law fraud claim. 
           The court’s charge 
that was read to the jury instructed that Gullo Motors violated the DTPA if it 
(1) breached an express warranty, defined as any affirmation of fact that 
related to the 2002 Highlander Limited and became part of the basis of its 
bargain with Chapa, or (2) engaged in any false, misleading, or deceptive act or 
practice upon which Chapa relied to her detriment. A false, misleading, or 
deceptive act or practice includes representing that goods or services are of a 
particular standard, quality, grade, or of a particular style or model, or, 
failing to disclose information concerning goods which was known at the time of 
the transaction if such failure to disclose was intended to induce the consumer 
into a transaction the consumer would not have entered had the information been 
disclosed. As for the common-law fraud claim, the jury was instructed that Gullo 
Motors committed fraud if (a) it made a material misrepresentation, (b) the 
representation was made with knowledge of its falsity or made recklessly without 
any knowledge of the truth and as a positive assertion, (c) the representation 
was made with the intention that Chapa would act upon it, and (d) Chapa relied 
on the misrepresentation and thereby suffered injury. The evidence that Chapa 
presented to support her fraud claim also supported her DTPA claim, and vice 
versa. Because the legal services provided to advance the DTPA claim also 
advanced the fraud claim, the fees incurred cannot be segregated even under the 
Court’s own analysis.
 
* * *
 
For the 
reasons expressed, I respectfully dissent. 
 
 
 
 
__________________________________________
Harriet 
O’Neill
Justice
 
OPINION DELIVERED: December 22, 
2006.